# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-1219

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WALE KING,

*Defendant.*

Appeal of SHAMSIDEEN SHOBANDE

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 89 CR 462—**James B. Zagel**, *Judge.*

———————

ARGUED OCTOBER 31, 2003—DECIDED NOVEMBER 17, 2003

———————

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* More than 14 years ago a grand jury indicted Wale King on 10 counts of fraud. 18 U.S.C. §§ 1029(b), 1341. Sometime in August 1990, with trial just around the corner, King went underground. A warrant was issued for his arrest, and he was nabbed in May 1999, in New York City. Back in Chicago, King applied for release on bail. Surprisingly, in light of King's history, Judge Norgle granted this request provided that King could

find a surety for a $50,000 bond. The judge released King that very day, without waiting for a surety to underwrite the bond, and also allowed him to leave the jurisdiction. (King told the judge that he wanted to attend a conference in Louisiana.) Ten days later, while King was in Louisiana, two sureties—Shamsideen Shobande and Sulley Alawiye—co-signed King's appearance bond. In June 2000 King pleaded guilty to one count of the indictment, and sentencing was set for November. But he did not appear and is again a fugitive. Between the guilty plea and the date set for sentencing, Judge Zagel granted King's request to have his passport back so that he could visit a daughter in Nigeria. Bank and airline records reflect that King returned to the United States, but he did not return to court. His disappearance led the United States to demand the forfeiture of the bond, and the court entered a judgment against King, Alawiye, and Shobande.

Shobande has appealed; Alawiye and King have not. Shobande contends that, by changing the terms of King's bail without the sureties' consent, the court released any liability on his part. We must assume that the United States has been unable to collect from Alawiye, despite the fact that sureties must not be accepted unless they can assure payment, 18 U.S.C. §3142(c)(1)(B)(xii); Fed. R. Crim. P. 46(e). Otherwise Shobande's appeal is hard to understand. Actually a lot of things about this situation are hard to understand—the grant of bail in 1999 to someone who had been a fugitive for nine years (does the judicial system learn nothing from an accused's conduct?); the return of King's passport after his plea of guilty, at a time when he would have a strong reason to indulge his revealed preference for flight; and the failure of litigants and bench alike to protect the interest of the sureties. When King sought the return of his passport, a step that increased his ability to return to life as a fugitive, he did not notify the

sureties, who would have been entitled to object. Nor did the prosecutor or the judge alert them. So complete has been the disregard of the sureties' interest that notice of the motion to enter judgment against them was sent only to King's lawyer, leading to a default judgment (though this would have been proper in any event under Fed. R. Crim. P. 46(f)(3)(A), which permits judgment against a surety as part of any bail forfeiture). When the sureties found out and complained, seeking either exoneration or a reduction in their exposure, see Rule 46(f)(2)(B), the order denying this motion again went only to King's lawyer. After he learned of the final disposition, Shobande had to seek still further relief from the district court to obtain extra time to file an appeal.

When a defendant proposes any material change in the conditions of a bond that has been underwritten by sureties, they are entitled to notice and an opportunity to be heard—and to revoke their commitments if the judge alters the terms of release over their opposition. See *Reese v. United States*, 76 U.S. (9 Wall.) 13, 21 (1869), which holds that modifications to a bond made without the consent or knowledge of the surety may render the obligation unenforceable. If the defendant fails to notify the sureties, the prosecutor should do so; and if both sides fail to protect the sureties' entitlement, then the judge should ensure that notice is given. Cf. Fed. R. Crim. P. 46(f)(3)(C) (district clerk must mail notice to sureties at address of record). Although the surety appoints the clerk as agent for service of process, see Rule 46(f)(3)(B), it remains essential for the clerk (as agent) to send the notice forward; here, however, no one sought to serve the clerk as the sureties' agent. Liability on a bond is a matter of contract, independent of the criminal prosecution—this is why sureties have 60 days to appeal, the same period as in civil litigation to which the United States is a party, see *United States v. Santiago*, 826 F.2d 499, 502-03 (7th Cir. 1987)—and persons potentially liable

on a contract are entitled to notice and an opportunity to be heard during judicial proceedings that may affect their interests. Few decisions say this explicitly—maybe the point is viewed as so clear after *Reese* that repetition is unnecessary—but it is at all events a straightforward consequence of suretyship's contractual underpinnings. When they do not get notice, and the underlying agreement is materially altered to the sureties' detriment, then the sureties' obligation is discharged. See Arthur Adelbert Sterns, *The Law of Suretyship* §6.2 (5th ed. 1972) (James L. Elder, ed.).

It is too late to give the sureties notice and an opportunity to object, so they invoke the principle that a material change in the terms of release—which is to say a change that significantly augments the risk that the defendant will not appear when required—relieves them of their obligations. See *United States v. Gambino*, 17 F.3d 572 (2d Cir. 1994). That a material change in risk can discharge the surety's obligation is a staple of suretyship law; the principle is not limited to criminal cases. See *Restatement (Third) of Suretyship & Guaranty* §§ 37, 41(b)(i) (1996); *Law of Suretyship, supra.* Nor can it be limited to changes over the prosecutor's objection. The prosecutor contends that, because the United States opposed the return of King's passport, while the prosecutor in *Gambino* agreed to the change in conditions of release, the sureties must continue to stand behind King's appearance. We do not think that it can matter who favored the change; sureties' obligation rests on contract, so the right question to ask is what risk they agreed to accept. Having failed to notify the sureties of judicial proceedings that potentially affected their interests, the United States is not well situated to contend that judicial errors in changing the terms of King's release come at the expense of the sureties rather than the Treasury, or that the sureties would have approved had they been told

what was afoot. (Shobande denies that he would have agreed. The lack of timely notice forces us to take Shobande at his word.)

Still, to say that a material increase in risk can exonerate the surety is not to say that it always does so. It is necessary to ask whether the incremental risk came to pass. Suppose that the district court had released King on condition that he remain at home, with electronic monitoring of his movements. See 18 U.S.C. §3142(c)(1)(B)(iv). If the judge later permitted King to travel to New Orleans for a conference, that would have increased the sureties' risk; and if he had failed to return to Illinois, the realization of that risk would have made it inappropriate to collect from the sureties. Now suppose, however, that King *did* return and was again required to remain home with electronic monitoring. If he sawed off the ankle bracelet and bolted for parts unknown, the sureties would remain liable—for *that* form of flight would have been exactly the risk they took. The authorized trip would not have played a role. One can say much the same about the actual events. The judge authorized King to travel to Nigeria, and had he stayed there the sureties would have had a good defense to payment. He did not remain abroad, however; King returned to New York (where the original bond allowed him to reside) and only *then* vanished. The risk of that disappearance is exactly the one these sureties voluntarily took.

At oral argument Shobande's counsel suggested that King may have had the passport duplicated by forgers and used the copy to assist his flight. Of that, however, there is no evidence. Indeed, there is essentially no evidence, period. The sureties did not introduce or proffer any, nor did they seek discovery. We do not know whether King surrendered the passport after returning from Nigeria in December 2000. For all we can tell, King is hiding somewhere in New York. When conditions of bond are violated, forfeiture is presumed. See Fed. R. Crim. P. 46(f)(1). Sureties must

shoulder the burden of demonstrating entitlement to exoneration or reduction. Fed. R. Crim. P. 46(f)(2)(B), (g). The paucity of evidence therefore redounds to the sureties' detriment. Shobande has not demonstrated that King's disappearance may be attributed to the incremental risk associated with the change in conditions, as opposed to the original risk associated with posting bond for a defendant with an established propensity for flight.

AFFIRMED

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*