# United States Court of Appeals for the Federal Circuit

---

**UNITED STATES,**
*Plaintiff-Appellant,*

v.

**GREAT AMERICAN INSURANCE COMPANY OF NEW YORK (also known as American National Fire Insurance Company),**
*Defendant-Cross Appellant,*

AND

**WASHINGTON INTERNATIONAL INSURANCE COMPANY,**
*Defendant-Appellee.*

---

2012-1462, -1473

---

Appeals from the United States Court of International Trade in No. 09-CV-0187, Senior Judge Richard W. Goldberg.

---

Decided: December 27, 2013

---

JEANNE E. DAVIDSON, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for plaintiff-appellant. With her on the brief was STUART F. DELERY, Acting

Assistant Attorney General. Of counsel on the brief were BARBARA S. WILLIAMS, Attorney in Charge, International Trade Field Office, of New York, New York; AMY M. RUBIN, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York; and ANDREW G. JONES, JOSEPH M. BARBATO and BRANDON T. ROGERS, Attorneys, Office of Assistant Chief Counsel, United States Customs and Border Protection, of Indianapolis, Indiana.

CARTER G. PHILLIPS, Sidley Austin, LLP, of Washington, DC, argued for defendant-cross appellant. With him on the brief were MARK D. PLEVIN and ALEXANDER M. SCHAEFER, Crowell & Moring, LLP, of Washington, DC, and THEODORE R. POSNER, Weil Gothshal & Manges, LLP, of Washington, DC.

HERBERT C. SHELLEY, Steptoe & Johnson, LLP, of Washington, DC, for amicus curiae. With him on the brief was MARK F. HORNING.

_____

Before PROST, PLAGER, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

The United States sued Great American Insurance Company of New York (also known as American National Fire Insurance Company) and Washington International Insurance Company in the Court of International Trade, seeking payment of antidumping duties covered by surety bonds the two companies had issued. The trial court granted summary judgment in favor of the government on the bonds now at issue, but denied the government's motion to amend the judgment to include post- and pre-judgment interest. The government appeals the denial of its motion to amend. Great American cross-appeals the grant of summary judgment of liability for the bonded

amounts. For the reasons set forth below, we affirm except with regard to postjudgment interest.

## BACKGROUND

On March 26, 1997, the United States Department of Commerce made a preliminary determination, pursuant to 19 U.S.C. § 1673b, that freshwater crawfish tail meat from the People's Republic of China (PRC) was being sold in the United States at less than fair value. Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed. Reg. 14392-01 (Dep't Commerce Mar. 26, 1997) (prelim. determination). As required by 19 U.S.C. § 1673b(d)(2), Commerce directed the United States Customs and Border Protection, until further notice, to suspend liquidation of (*i.e.*, the final computation of duties on, 19 C.F.R. § 159.1) all entries of freshwater crawfish tail meat from the PRC and to require a cash deposit or bond to cover the antidumping duties estimated upon entry. 62 Fed. Reg. at 14397. On August 1, 1997, Commerce issued a final determination upholding its preliminary determination and directing Customs, until further notice, to suspend liquidation and to require cash deposits. Freshwater Crawfish Tail Meat From the People's Republic of China, 62 Fed. Reg. 41347-02, 41358 (Dep't Commerce Aug. 1, 1997), amended by 62 Fed. Reg. 48,218 (Dep't Commerce Sep. 15, 1997) (final determination).

On seven occasions between October 5, 2000, and May 17, 2001, an importer named New Phoenix International Trade Corporation made entries of freshwater crawfish tail meat from the PRC by completing the required paperwork. *See* 19 U.S.C. § 1484. The exporters that provided the meat to New Phoenix were subject to a "new shipper" review being conducted by Commerce, *see* 19 U.S.C. § 1675(a)(2)(B), which examined whether they were entitled to antidumping-duty rates distinct from the rate that applied as a default to exporters from the PRC. As a result, Commerce permitted New Phoenix to post a

bond to cover its anticipated antidumping duties. Freshwater Crawfish Tail Meat From the People's Republic of China, 64 Fed. Reg. 61833-01, 61834 (Dep't Commerce Nov. 15, 1999) (new shipper review).

To meet the bonding requirements of 19 U.S.C. § 1675(a)(2)(B)(iii) and 19 C.F.R. § 351.214(e), New Phoenix posted eight single-transaction bonds issued by Great American and one continuous-transaction bond issued by Washington International to cover the seven entries. Each of the five Great American bonds relevant to this appeal was for $1,219,458 and was signed by James C. Davis, an agent of Great American. Mr. Davis signed the bonds, and the government accepted them, even though at least one copy of the power-of-attorney form that Great American filed with Customs for Mr. Davis—Customs Form 5297, dated May 21, 1996, filed pursuant to 19 C.F.R. § 113.37(g)—indicated a limit of $1 million on Mr. Davis's authority. On November 2, 2001, several months after New Phoenix obtained its last bond from Mr. Davis and made the associated entry, Great American filed a new Form 5297 revoking Mr. Davis's power of attorney.

On October 26, 2001, Commerce issued a notice that it was initiating an administrative review of the antidumping-duty order relating to freshwater crawfish tail meat from the PRC for the period September 1, 2000, to August 31, 2001—the period in which New Phoenix made each of the entries at issue here. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 66 Fed. Reg. 54195-02, 54196 (Dep't Commerce Oct. 26, 2001). Liquidation of those entries continued to be suspended pending the outcome of the administrative review. 19 U.S.C. §§ 1504(a), 1675(a); *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1118 (Fed. Cir. 1998) ("During an annual review by Commerce, 'liquidation' of all entries of merchandise subject to the outstanding countervailing duty order is suspended . . . because the annual review scheme

established in 19 U.S.C. § 1675(a) would be frustrated unless the final results of the review applied to the entries covered by the review."). Customs gave notice of the suspension to New Phoenix and Washington International, pursuant to 19 U.S.C. § 1504(c), but Customs did not notify Great American.

On April 21, 2003, Commerce published the final results of its administrative review for the entries relevant to this appeal, finding that the exporter for the relevant entries was not entitled to a rate different from the default rate for PRC exporters. Freshwater Crawfish Tail Meat from the People's Republic of China, 68 Fed. Reg. 19504-01 (Dep't Commerce Apr. 21, 2003) (final admin. review). Customs made its final determination of the duties applicable to (*i.e.*, it liquidated) the entries relevant to this appeal between July 25, 2003, and August 15, 2003, and then sought payment of the duties from New Phoenix, Washington International, and Great American, without success.

On May 8, 2009, the government sued Great American and Washington International in the Court of International Trade, pursuant to 28 U.S.C. § 1582(2), seeking to recover the value of the bonds along with pre- and postjudgment interest. Complaint, *United States v. Great Am. Ins. Co. of N.Y.*, Case No. 09-CV-0187 (Ct. Int'l Trade May 8, 2009), ECF No. 2. It is undisputed that the amount of duties owed for the entries at issue is greater than the amounts of the bonds. *Id.* ¶¶ 11, 15. Each party moved for summary judgment in September 2010. Of significance to the present appeal, the government's briefing on its motion did not include any heading on, textual discussion of, evidence relating to, or argument for prejudgment interest (or, for that matter, postjudgment interest). The government ended its motion by asking for "the relief requested in the Complaint," and it attached a proposed order awarding it the value of the bonds "plus interest in accordance with 19 U.S.C. § 580." Pl.'s Mot.

Summ. J., *United States v. Great Am. Ins. Co. of N.Y.*, Case No. 09-CV-0187 (Ct. Int'l Trade Sep. 17, 2010), ECF No. 64.

On August 31, 2011, the trial court granted the government's motion for summary judgment with respect to five of the Great American bonds and the Washington International bond, but the court was silent about pre- and postjudgment interest. *United States v. Great Am. Ins. Co. of N.Y.*, 791 F. Supp. 2d 1337, 1368 (Ct. Int'l Trade 2011). The court entered judgment in the amount of the face value of the bonds, without interest. Judgment, *United States v. Great Am. Ins. Co. of N.Y.*, Case No. 09-CV-0187 (Ct. Int'l Trade Aug. 31, 2011), ECF No. 101.

The government moved to amend the judgment under USCIT Rule 59(e) to include postjudgment interest, as well as both prejudgment interest under 19 U.S.C. § 580 and equitable prejudgment interest. Mot. Am. J., *United States v. Great Am. Ins. Co. of N.Y.*, Case No. 09-CV-0187 (Ct. Int'l Trade Sep. 21, 2011), ECF No. 102. On April 11, 2012, the court declined to award postjudgment interest "because the Government did not address this issue in its motion [to amend]." *United States v. Great Am. Ins. Co. of N.Y.*, Case No. 09-CV-0187, 34 ITRD 1408, at *3 n.4 (Ct. Int'l Trade Apr. 11, 2012). The court denied prejudgment interest on the ground that the government had not timely developed the issue before judgment. *Id.* at *2-3.

The government appeals the denial of its motion to amend, and Great American cross-appeals the grant of summary judgment in favor of the government. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

A

The government seeks postjudgment interest as well as both statutory and equitable prejudgment interest in its appeal from the denial of its motion to amend the judgment. We review the trial court's denial of the government's motion to amend for any abuse of discretion. *Hohenberg Bros. Co. v. United States*, 301 F.3d 1299, 1303 (Fed. Cir. 2002).

1

With respect to postjudgment interest, 28 U.S.C. § 1961(a) provides that such "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." Although section 1961 does not directly apply to judgments rendered by the Court of International Trade, *see* 28 U.S.C. § 1961(c)(4), that court has awarded postjudgment interest at the rate set out in section 1961, based on the declaration of 28 U.S.C. § 1585 that the Court of International Trade "shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." *See United States v. C.H. Robinson Co.*, 880 F. Supp. 2d 1335, 1348 (Ct. Int'l Trade 2012); *United States v. Ford Motor Co.*, 31 C.I.T. 1178, 1182 (2007); *United States v. Golden Gate Petroleum Co.*, 30 C.I.T. 174, 183 n.9 (2006); *United States v. New-Form Mfg. Co., Ltd.*, 27 C.I.T. 1597 (2003); *Am. Permac, Inc. v. United States*, 116 F. Supp. 2d 1317, 1323 (Ct. Int'l Trade 2000); *United States v. Hitachi Am., Ltd.*, 101 F. Supp. 2d 830, 838 (Ct. Int'l Trade 2000); *United States v. Monza Automobili*, 683 F. Supp. 818, 821 (Ct. Int'l Trade 1988). And other circuits have held that postjudgment interest under section 1961 is mandatory and may not be denied for failure to raise the issue until judgment. *See, e.g., Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh*, 735 F.3d 993, 1007-08 (8th Cir. 2013); *Vazquez-Filippetti v. Cooperativa de*

*Seguros Multiples de Puerto Rico*, 723 F.3d 24, 28 (1st Cir. 2013).

In its briefing in this court, Great American did not argue that section 1585's incorporation of district-court "powers" excluded or moderated section 1961's "shall" command to district courts; nor did it seek to distinguish the ground for denial of postjudgment interest here from the grounds held inadequate in section 1961 cases like those just cited. Indeed, Great American made no argument at all contesting the government's entitlement to *post*judgment interest here, if the underlying liability is affirmed. It did not contest postjudgment interest at oral argument either. In these circumstances, and because we affirm on liability, we remand for the trial court to amend the judgment to include postjudgment interest.

2

With respect to prejudgment interest, our conclusion is different. We find no abuse of discretion in the trial court's conclusion that the government forfeited its right to prejudgment interest by failing to present a developed and supported case for that relief before judgment, *i.e.*, in its case for the compensation it was due on the merits, presented here through a motion for summary judgment.

Unlike postjudgment interest, which is collateral to the judgment itself, prejudgment interest "traditionally has been considered part of the compensation due plaintiff" and raises "matters encompassed within the merits of the underlying action," such as (at least for equitable prejudgment interest) "the degree of personal wrongdoing on the part of the defendant, the availability of alternative investment opportunities to the plaintiff, whether the plaintiff delayed in bringing or prosecuting the action, and other fundamental considerations of fairness." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175-76 (1989). As the Seventh Circuit held in another setting, because prejudgment interest is "an element of the judgment

itself," it generally must be sought before judgment, with the support and development needed for other elements of the requested judgment. *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 410 (7th Cir. 1999) (quotation marks omitted). The logic of that general requirement applies regardless of whether the source of the prejudgment interest claim is section 580 or a background "equitable" principle.

Practical considerations reinforce application of that requirement here. The equitable considerations that affect equitable prejudgment interest raise obvious issues for development through evidence and argument. An award under section 580, at least under current law, raises issues requiring development as well. In *United States v. Federal Insurance Co.*, 857 F.2d 1457 (Fed. Cir. 1988), we described section 580 interest as mandatory in holding simply that, where this court had reversed a Court of International Trade rejection of a government suit for payment of certain import duties (by the importer or the surety), this court's failure to mention section 580 in its mandate did not bar the Court of International Trade from ordering such interest on remand. But that decision leaves open a number of questions that called for substantial attention in this case.

*Federal Insurance* had no occasion to consider what range of equitable considerations might affect the application of section 580 where it applies. And *Federal Insurance* did not involve antidumping duties at all. In fact, this court has never considered whether section 580 applies to antidumping or countervailing duties. The government has informed us that only recently did it even begin to invoke section 580 in cases involving antidumping (or, apparently, countervailing) duties—a seemingly major change in the government's asserted position on the

scope and relationship of old laws.[1]  In at least one other context, based on widely applicable doctrines about the relationship between specific statutory schemes and more general statutory language, the Court of International Trade has relied on the detailed statutory regime for antidumping and countervailing duties to distinguish them from general "duties" covered under other provisions of Title 19, saying: "It seems that antidumping and countervailing duties were never intended to be regular or general duties." *Dynacraft Indus., Inc. v. United States*, 118 F. Supp. 2d 1286, 1291 (Ct. Int'l Trade 2000); *id.* at 1291-92.  In several respects, then, the government's invocation of section 580 here presented anything but a ministerial matter; it raised significant issues that the trial court could properly view as calling for development before judgment.

In seeking to apply section 580 here, the government contends that, unlike equitable prejudgment interest, interest under section 580 is not compensatory, but rather is a "statutory exaction" in the nature of a penalty—and, for that reason, applies *in addition* to equitable prejudgment interest.  On the question of failure to preserve the point, that characterization, whatever its merits, does not help the government, which identifies no precedent or principle suggesting that a penalty characterization

---

[1]    The government stated at oral argument that it has only lately asserted entitlement to section 580 interest in the antidumping context and that no court has ever considered this issue.  Oral Argument at 00:41-01:11. Section 580 has its origins in a 1799 law, whose language was revised slightly in the 1870s.  Act of March 2, 1799, ch. 22, § 65, 1 Stat. 677; 1 Rev. Stat. 181, § 963 (1875). Antidumping duties have been authorized for more than ninety years. *See Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1571-72 (Fed. Cir. 1994).

would license waiting until after judgment to develop the claim under section 580 (let alone as a part of claim for dual-source interest). Penalties are commonly part of the merits relief sought, not something collateral to a judgment. *See, e.g.*, *Uphoff*, 176 F.3d at 410 (request for penalty under state minimum-wage law had to be raised before judgment). Moreover, the characterization of section 580 as a penalty hardly makes it a ministerial matter—and not just because the correctness of the characterization is a substantial issue. The characterization leaves, rather than disposes of, questions about whether section 580 applies to antidumping duties at all and whether, if so, case-specific equitable considerations are relevant to its application, as is common under other, variously worded authorizations to apply penalties.[2] Thus, it remains the case that the novelty of the government's theory, which presents significant issues warranting substantial legal and possibly factual development, makes it appropriate to require prejudgment development. *Uphoff*, 176 F.3d at 410 ("Rule 59(e) may not be

---

[2]    *See, e.g.*, *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages available under 15 U.S.C. § 1681n(a) if violation of Fair Credit Reporting Act is willful, as opposed to negligent); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999) (42 U.S.C. § 1981a authorizes punitive awards in only a subset of intentional discrimination cases, where defendant acted with malice or reckless indifference); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 565 (1996) (Alabama law permits punitive damages in tort actions where defendant's conduct was deliberately oppressive, fraudulent, wanton, or malicious); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 606 (1993) (liquidated damages available under 29 U.S.C. § 626(b) for willful violations of the Age Discrimination in Employment Act of 1967).

used to raise novel legal theories that a party had the ability to address in the first instance.").

The trial court could reasonably find that the government did not sufficiently develop, or therefore preserve, a claim for prejudgment interest. In its summary-judgment filings, the government did no more than end its brief with a prayer for the relief requested in the complaint and attach a proposed order that included interest calculated under section 580. It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases); *United States v. Charles*, 469 F.3d 402, 408 (5th Cir. 2006) ("Inadequately briefed issues are deemed abandoned."). That principle makes particular sense where the claim at issue raises substantial issues. That is the case here, because the government's request for prejudgment interest raises significant questions about, for example, the equitable considerations attending equitable interest and/or section 580 interest, the novelty of application of section 580 to antidumping duties, and the soundness of the theory that both types of interest should be awarded.

It may be (we need not say) that the government could have preserved its claim by making a short affirmative presentation in its initial brief requesting summary judgment; doing so would have given Great American clear notice of its obligation to present its legal and evidentiary responses to the government's novel claim, and the government then would have presented its full answers in reply. But the government did not do even that. We know of no general rule that, as a matter of law, excuses a movant from presenting a claim in its merits discussion, just because an opening presentation could be short. Here it was reasonable for the trial court to conclude that the argument for prejudgment interest should

have been, but was not, actually developed before judgment.

A Rule 59(e) motion "cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990). Thus, the court acted within its discretion in concluding that the government's arguments in support of prejudgment interest, briefed for the first time in its motion to amend, came too late. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 572 (7th Cir. 2009). Preservation principles are important to a well-functioning litigation system, particularly, perhaps, for regular litigants like the government. The trial court did not abuse its discretion in invoking those principles here to deny prejudgment interest.

## B

In its cross-appeal, Great American argues that the trial court erred in granting summary judgment enforcing the bonds. Great American argues that the government's failure to notify Great American of the suspension of liquidation of the entries at issue bars its recovery on two separate grounds. It also argues that the bonds are unenforceable because they exceed Mr. Davis's $1 million authority. We review the grant of summary judgment de novo. *Int'l Trading Co. v. United States*, 412 F.3d 1303, 1307 (Fed. Cir. 2005).

## 1

Great American raises two defenses based on the government's failure to notify it that liquidation of the entries at issue had been suspended. First, it contends that the failure to notify it as required by 19 U.S.C. § 1504(c) invalidated the suspension as a matter of law, that liquidation therefore occurred and the government's claim accrued by May 17, 2002, and that the government suit, brought more than six years after that date, is accordingly

time-barred under the six-year statute of limitations, 28
U.S.C. § 2415(a). Second, Great American argues that the
lack of notice impaired its suretyship by altering its risk
of loss and that it is therefore discharged from its obliga-
tion under the bond. We consider each argument in turn.

a

When liquidation of an entry has been suspended, 19
U.S.C. § 1504(c) requires that "notice of the suspension be
provided . . . to the importer of record . . . *and to any*
authorized agent and *surety of such importer* of record
. . . ." (Emphases added.) Section 1504(c) therefore "im-
poses a duty on Customs to notify the [surety] if liquida-
tion is suspended." *Wolff Shoe*, 141 F.3d at 1118. It is
undisputed on appeal that Customs erred by not notifying
Great American (it did notify New Phoenix and Washing-
ton International) that liquidation of the entries at issue
had been suspended.

Although section 1504(c) does not set out any specific
remedy for its violation, the absence of a specified remedy
does not itself mean that the notice requirement is merely
advisory or that failure to provide the required notice is
without consequence, as the government contends. The
Supreme Court has indicated that, in at least some cir-
cumstances, it "presume[s] the availability of all appro-
priate remedies unless Congress has expressly indicated
otherwise." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503
U.S. 60, 66 (1992). We need not explore the remedial
issue broadly, though, because the only issue presented
here is whether the trial court properly rejected (on
summary judgment) the particular remedy Great Ameri-
can seeks—invalidation of the suspension, with certain
alleged consequences for the bonds' enforceability.

We have held that "[a]n agency's violation of a statu-
tory procedural requirement does not necessarily invali-
date the agency action, especially where Congress has not
expressed any consequences for such a procedural viola-

tion." *Diaz v. Dep't of Air Force*, 63 F.3d 1107, 1109 (Fed. Cir. 1995). The Supreme Court has said: "We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." *Brock v. Pierce Cnty.*, 476 U.S. 253, 259-60 (1986). No more should Customs's procedural error, in failing to provide a statutorily required notification, necessarily invalidate a suspension of liquidation that, like the suspension here, occurred automatically by operation of law.

Rather, in accordance with the Administrative Procedure Act, which governs the trial court's review as well as our own, we must take "due account . . . of the rule of prejudicial error" in reviewing Customs's failure to notify Great American that liquidation had been suspended. 5 U.S.C. § 706. Because section 706 establishes a harmless-error rule, *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009), the suspension in this case could be invalidated only if Great American showed that the agency's procedural error caused it substantial prejudice, *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996); *PAM S.p.A. v. United States*, 463 F.3d 1345, 1348-49 (Fed. Cir. 2006). This approach, required by the APA, is hardly idiosyncratic: in other areas of law, a showing of prejudice is often required when a party seeks discharge from a substantive obligation based on another's procedural error.[3]

---

[3] *See, e.g.*, *Hanson Prod. Co. v. Americas Ins. Co.*, 108 F.3d 627, 629 (5th Cir. 1997) (under Texas law, insurers must show prejudice in order to prevail on late-notice defense); *O'Connor v. UNUM Life Ins. Co. of Am.*, 146 F.3d 959, 961-62 (D.C. Cir. 1998) (California's "notice-prejudice" rule requires insurer to prove actual, substantial prejudice, which is not presumed from delayed notice

In this case, the trial court correctly concluded that Great American did not present sufficient evidence of prejudice to create a triable issue of fact regarding prejudice from the government's procedural error. Great American argues that the government's failure to send it a separate notice of suspension injured it because, had it gotten such a notice, it could have sought reinsurance, ceased doing business with the importer to limit its future risk, or attempted to minimize its loss on these bonds by participating in the administrative review of the duties at issue and arguing for a lower rate for the entries covered by the bonds. But the trial court correctly recognized that certain of the identified possible actions are irrelevant to the single-transaction bonds at issue here, because altering future business policies could not limit the risk Great American had already incurred under the bonds in question. *Great Am. Ins.*, 791 F. Supp. 2d at 1356-57. In any event, and decisively, each of Great American's generalized suggestions of potential action is insufficient to create a genuine issue of material fact on the record here, which included Great American's admissions that it had received other suspension notices and simply forwarded them to the agents without taking any additional action, and that it has *never* participated in an administrative review. J.A. 330a-32a.

While those admissions would not themselves automatically preclude Great American from showing that it would have acted in this case, it was incumbent upon

---

alone); *cf. United States v. Concha*, 294 F.3d 1248, 1256 (10th Cir. 2002) (insufficient notice that court could rely on foreign conviction was harmless where defendant failed to show prejudice); *Blaney v. West*, 209 F.3d 1027, 1032 (7th Cir. 2000) (district court's failure to give actual notice before dismissing case was harmless error where the plaintiff was not prejudiced by the lack of notice).

Great American to come forward with evidence that in this case—unlike prior cases—notification would likely have led it to take action, with some relevant probability of averting the alleged harm. *Sanders*, 556 U.S. at 408 (conclusion as to harmless error must rest "on the facts and circumstances of the particular case"); *id.* at 409 ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). Great American did not do so. It claimed generally that it could have minimized its risk by participating in the rate review (which it has never done before), but it did not identify any evidence or arguments that were missing from the administrative record or show how they could have altered the outcome of the review. *Great Am. Ins.*, 791 F. Supp. 2d at 1358.[4] Although counsel for Great American suggested at oral argument before this court that this case was different because the amount in controversy was much greater than in any prior case, Oral Argument 23:53-24:56, Great American did not present that argument in the trial court with supporting facts. Its summary-judgment opposition suggested only that the government should have considered "whether Great American . . . had ever received suspension notices for entries with dollar amounts as large as the amounts at issue in this case." Great Am.'s Opp. to Pl.'s Mot. Summ. J. at 9, *United States v. Great Am. Ins. Co. of N.Y.*, Case No. 09-CV-0187 (Ct. Int'l Trade Oct. 22, 2010), ECF No. 82. That suggestion about what the government might consider is no substitute, on summary judgment, for

---

[4]    *Cf. City of Arlington, Tex. v. FCC*, 668 F.3d 229, 244-45 (5th Cir. 2012) (failure of the Federal Communications Commission to comply with notice-and-comment procedures was harmless where party asserting error could not show prejudice and did not identify "a single argument . . . that was not considered by the FCC in the agency proceedings below").

presentation of evidence—here, evidence of other actual bonds and how their amounts compare to those of the present bonds. Thus, Great American did not present the trial court with any supported reason that notice would likely have spurred it, in a departure from its historical practice, to take harm-avoiding action in this case.

The trial court's conclusion is reinforced by the fact that Great American was not without *any* notice of the suspension in this case. Great American recognizes that suspension of liquidation began when Commerce made its preliminary determination of dumping, *see* 19 U.S.C. § 1673b(d)(2), before the bonds at issue here were even issued, and it acknowledged in discovery that each of the bonds in question includes on its face a code indicating that the covered entries were subject to an antidumping duty order. In addition, notice of the initial and continued suspension of liquidation of entries covered by the order was repeatedly published in the Federal Register, years before the publication of the final results of the administrative review. Freshwater Crawfish Tail Meat from the People's Republic of China, 62 Fed. Reg. at 14,397 (prelim. determination); 62 Fed. Reg. at 41,358, amended by 62 Fed. Reg. 48,218 (final determination); 64 Fed. Reg. at 61,834 (new shipper review); 19 C.F.R. § 351.214(e) (suspension based on new shipper review); 66 Fed. Reg. at 54,196 (initiation of admin. review). In general, publication in the Federal Register is legally sufficient to provide notice to interested parties. *See, e.g.*, 44 U.S.C. § 1507 (filing of a document with the Office of Federal Register is sufficient to give notice of the contents of the document to a person subject to or affected by it); *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947) ("Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."); *Jones v. United States*, 121 F.3d 1327, 1330 (9th Cir. 1997) (publication in the Federal Register constitutes legally sufficient notice). Thus, although section 1504(c)

requires an additional notice to the surety, Great American cannot claim that it received *no* notice.

In short, the record is devoid of sufficient evidence that omitting the additional notice required by section 1504(c) robbed Great American of the opportunity to take loss-mitigating actions it otherwise would have been likely to take in this case. Because Great American did not present evidence that created a triable issue of fact regarding prejudice, we affirm the trial court's conclusion that the suspension of liquidation was valid. As is undisputed, it follows that the government's cause of action accrued when Customs liquidated the relevant entries starting in late July 2003 and the government's suit was not time-barred.

b

Great American also argues that Customs, by failing to provide notice pursuant to section 1504(c), impaired Great American's suretyship, *i.e.*, fundamentally altered its risk of loss, with the result that it is discharged from liability under the bonds. For reasons similar to those just discussed, we affirm the trial court's conclusion that Great American did not present sufficient evidence to create a triable issue of fact on its defense of impairment of suretyship.

Offered no reason to do otherwise, we rely on the Restatement (Third) of Suretyship & Guaranty § 37(1) (1996) in considering this defense. Section 37(1) provides:

> If the obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance, the secondary obligor is discharged as described in subsections (2) and (3), and the secondary obligor has a claim against the obligee as described in subsection (4). An act that increases

the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance is an "impairment of suretyship status."

Under that standard, in order for Great American to be discharged from its bond obligations, the government must have fundamentally altered the risks imposed on Great American, as detailed in section 37(2), or impaired Great American's recourse against New Phoenix, as detailed in section 37(3). Because there is no claim that the government impaired Great American's recourse against New Phoenix, Great American's defense depends on whether the government's failure of notice fundamentally altered its risk. For the reasons discussed above with respect to lack of prejudice, we conclude that the trial court properly determined that Great American failed to show that the record created a genuine issue of material fact precluding summary judgment.

In order to be discharged from its obligations under the bond, Great American would have to show that the lack of section 1504(c) notice materially modified the contract to which it originally agreed by substantially increasing its risk. *See, e.*g, *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1313-14 (Fed. Cir. 2011); *United States v. King*, 349 F.3d 964, 967 (7th Cir. 2003) (material modification is one that "significantly augments the [surety's] risk"). But because, as just discussed, Great American did not allege facts sufficient to show that either its own conduct or the ultimate outcome would have been different had it received the required notice, there is no evidence that its risk was increased by the government's error—let alone substantially increased. *See King*, 349 F.3d at 968 (surety not discharged where it failed to demonstrate that liability was attributable to "the incremental risk associated with the change in conditions, as opposed to the original risk associated with

posting bond"). Accordingly, we affirm the trial court's conclusion that the facts supporting Great American's impairment-of-suretyship defense, even when viewed in the light most favorable to Great American, are insufficient to preclude summary judgment in favor of the government.

2

Great American challenges the summary judgment in favor of the government on one additional ground. It argues that the bonds in question are unenforceable because each bond was for an amount that exceeded the issuing agent's alleged $1 million authority by $219,458. Great American advanced this argument in the trial court as an affirmative defense to the government's recovery, both in response to the government's motion for summary judgment and in its own cross-motion for summary judgment. Great Am.'s Mot. Summ. J. at 24-40, *Great Am. Ins.*, Case No. 09-CV-0187 (Ct. Int'l Trade Sep. 24, 2010), ECF No. 72-1; Great Am.'s Opp. to Pl.'s Mot. Summ. J. at 15-27.[5]

---

[5] Great American did not argue in the alternative, either in its own motion or in response to the government's motion for summary judgment to enforce the bonds, that its liability should be limited to $1 million. *Cf.* Restatement (Third) Of Agency § 6.05(1) (2006) (where amount of contract exceeds actual or apparent authority, liability may be imposed for authorized amount in specified circumstances). Without citation to any legal authority, the government invoked the possibility of such limited liability in a one-sentence footnote in its response to Great American's motion for summary judgment. Pl.'s Opp. to Great Am.'s Mot. Summ. J. at 12 n.13, *Great Am. Ins.*, Case No. 09-CV-0187 (Ct. Int'l Trade Oct. 21, 2010), ECF No. 78.

Great American relies for this contention almost exclusively on a Customs regulation. For context, we note first a regulation that Great American does not invoke: 19 C.F.R. § 113.37(a) provides that "Treasury Department Circular 570 contains a list of corporations authorized to act as sureties on bonds" and that, in the absence of certain measures to limit risk, "no bond shall be for a greater amount than the respective limit stated in the Circular." That provision, which addresses the surety corporation's own stated limitation on its bonds, is not applicable here, because Great American does not claim that the bonds at issue exceeded the amount stated in its Circular 570 filing.

Rather, the provision invoked by Great American is one concerning a surety corporation's grant of a power of attorney to an agent acting on its behalf in posting bonds. Section 113.37(g) provides that corporate sureties "may execute powers of attorney to act in their behalf" by filing Customs Form 5297. 19 C.F.R. § 113.37(g). It requires that the form include a "[d]ollar amount of authorization," *id.* § 113.37(g)(1)(vii), and forbids changes to that authorization unless the surety submits one Form 5297 revoking the existing power of attorney and a second Form 5297 containing a new grant of authority, *id.* § 113.37(g)(5). Unlike section 113.37(a), however, section 113.37(g) does not state that no bond shall exceed an agent's authority as stated on Form 5297.

The government's records conflict with Great American's as to the authorization amount on file with Customs for Mr. Davis, the agent who signed the bonds in question. The government's records listed Mr. Davis as having authority up to the surety's own limit as published in the annual circular ($2,694,000 at the time Mr. Davis's authority was revoked). J.A. 257-58. Great American, on the other hand, produced a partial copy of a Form 5297 listing Mr. Davis's authority as $1 million, which it contends was filed with Customs in 1996. J.A. 256. Given

the dispute, the trial court assumed for purposes of summary judgment that Great American filed a Form 5297 with Customs limiting Mr. Davis's authority to $1 million. *Great Am. Ins.*, 791 F. Supp. 2d at 1348. Even on that assumption, however, the court concluded that the government was entitled to a summary judgment, on the record here, that Great American's actions provided apparent authority that bound it to amounts in excess of $1 million, and that the bonds were therefore valid and enforceable. *Id.* at 1347-49.

As defined in Restatement (Third) Of Agency § 2.03 (2006),

> [a]pparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.

The principal's manifestations need not be conveyed through words or actions. Rather, "[s]ilence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the inference that other persons will draw from silence. Failure then to express dissent will be taken as a manifestation of affirmance." *Id.* § 1.03 cmt. b. The trial court here considered the issue of apparent authority from the perspectives of both New Phoenix and the government, and it determined that each reasonably believed that Mr. Davis had authority to issue the bonds. *Great Am. Ins.*, 791 F. Supp. 2d at 1347-49. Great American does not challenge the finding with respect to New Phoenix, but it argues that, given the provisions of section 113.37(g)(5), the government could not reasonably believe that Mr. Davis's $1 million authority could be increased by any means other than the filing of a new Form 5297.

Great American's position rests on an unwarranted view of the regulation's effect on apparent authority. The central premise of apparent authority is that legally effective authority can in fact go beyond an expressly stated grant of actual authority. Whether the government should have known that Mr. Davis's previously stated actual authority was limited to $1 million is not dispositive. Although, as a general matter, "[a]n agent does not act with apparent authority when a third party has reason to know that the agent acts without actual authority," Restatement (Third) Of Agency § 6.11 cmt. b (2006), the course of dealing between the parties may naturally alter what the third party has reason to know, and a manifestation that gives rise to apparent authority "may be made by conduct alone or by conduct that carries meaning at odds with words expressed previously . . . ," *id.* § 1.03 cmt. e. Accordingly, a principal's manifestations may lead a third party reasonably to believe that an agent has authority to act, even where the principal's previous written statement indicated that the agent's authority was more limited. *See, e.g.*, *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 17 (1997) (holding that it was reasonable for a third party to believe that an agent had authority to sign an agreement, despite the third party's having received a directive that the principal's approval was required for such expenditures, because other payments had been authorized without the required approval even after the directive was issued).

Against that background, 19 C.F.R. § 113.37(g)(5), on which Great American relies for almost the entirety of this defense, cannot be read as protecting Great American against a finding of apparent authority. The regulation is not even written as a directive to Customs to reject certain bonds. Rather, in providing an amount of authorization, it protects Customs against any later denial of actual authority by the corporate surety, unless that surety revokes a Form 5297 that is on file. But that protection

for Customs does not deprive Customs of the right to rely on apparent authority that otherwise exists.

The question, then, is not whether Great American told the government that Mr. Davis's authority was limited to $1 million—we assume, as the trial court did, that the disputed Form 5297 was filed—but whether a reasonable person in the government's position would nevertheless believe that Great American's subsequent conduct gave Mr. Davis apparent authority to issue bonds in excess of $1 million. Although the existence of apparent authority is normally a question of fact, Restatement (Third) Of Agency § 2.03 cmt. d (2006), summary judgment on this issue is appropriate if, viewed in the light most favorable to the non-moving party, the facts establish that the principal acted in a manner that gave its agent the appearance of authority. *See, e.g.*, *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 37 n.5 (1st Cir. 2011) (affirming summary judgment that apparent authority existed as a matter of law); *Am. Nat. Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 267 (2d Cir. 1995) (same).

Here, the dispositive facts are not in dispute, and without Great American's mistaken view of the effect of the regulation, the facts properly support summary judgment of apparent authority. According to Great American's admissions, on more than one occasion between the years 1996 and 2001, Great American received reports listing bonds issued by Mr. Davis's agency with face values in excess of $1 million, and in at least one instance it specifically approved a request by the agency to issue a bond in excess of $1 million. J.A. 332h-j. The record also includes a report received by Great American that listed thirty-one "excessive bonds" (bonds exceeding the agent's authority) issued by Mr. Davis's agency between June 1996 and October 2000, along with copies of thirteen such bonds, nine of which bear Mr. Davis's signature. Great American has not disputed the accuracy of the report or the bonds, but argues that before 2003 it

was unaware that some of the bonds existed and it is unclear how many were actually presented to Customs. At least two of the bonds for which copies were produced, however, include bond numbers assigned by Customs, indicating that they were filed with Customs. There is no evidence that Great American ever objected to the government's acceptance of bonds in excess of $1 million from Mr. Davis's agency, or that Great American gave Customs any other indication that such bonds were not authorized.

As explained in the Restatement (Third) Of Agency § 3.03 cmt. b (2006),

> [a] principal's inaction creates apparent authority when it provides a basis for a third party reasonably to believe the principal intentionally acquiesces in the agent's representations or actions. . . . If the third party has observed prior interactions between the agent and the principal, the third party may reasonably believe that a subsequent act or representation by the agent is authorized because it conforms to the prior pattern observed by the third party. The belief is thus traceable to the principal's participation in the pattern and failure to inform the third party that no inferences about the agent's authority should be based upon it.

It is undisputed that, before issuing the New Phoenix bonds at issue in this appeal, Mr. Davis and his agency issued multiple Great American bonds that exceeded the issuing agent's authority, with no objection from Great American. Thus, even if the government should have known that Mr. Davis's power of attorney listed his authority as capped at $1 million, the pattern of agents exceeding their authority with no objection from Great American would lead a reasonable person in the government's position to believe that such acts were authorized.

Because its admissions as to the pattern of excessive bonds issued by Mr. Davis's agency are indisputable, the

best that Great American can do is contend that there is only "equivocal" evidence that it had any notice of excessive bonds issued by Mr. Davis specifically. But that contention is beside the point, under the governing standard. Because Great American was admittedly on notice that agents at Mr. Davis's company were exceeding their authority, it is immaterial whether Great American had notice as to Mr. Davis specifically, because Great American has not pointed to any evidence whatever that a reasonable person in the government's position would think that Mr. Davis's actions were less likely to be authorized than the actions of any other agent. On this record, therefore, the evidence based on bonds filed by Great American's agents generally, indeed by those from Mr. Davis's company, is controlling on the question of apparent authority. *Id.* § 2.03 cmt. d ("Custom supports the presence of apparent authority when an agent's act is within the limit of authority standard for agents in similar position and endeavors.").

Despite its clear admissions, Great American contends that the trial court erred by finding that Great American was on notice that its agents (including Mr. Davis) were issuing bonds in excess of $1 million, and that its silence was therefore not indicative that it approved Mr. Davis's excessive bonds. But Great American cites only testimony concerning what individual executives actually knew, confusing notice with knowledge. *Id.* § 1.04(4) ("A person has notice of a fact if the person knows the fact, *has reason to know the fact, has received an effective notification of the fact,* or should know the fact to fulfill a duty owed to another person.") (emphasis added). Moreover, it does not matter whether Great American was silent because it actually acquiesced in the bonds' issuance (as it admits it did in at least one instance) or because it remained ignorant of their existence due to oversight deficiencies that the government reasonably need not account for. In either event, the evidence

can support only one finding on the legally relevant question: it was reasonable for the government to interpret the pattern of bond postings as conferring the requisite authority on Mr. Davis. *See Kenealy*, 72 F.3d at 268-69 (rejecting Great American's contention that "a consumer who deals with a putative agent has the duty to determine the scope of the agent's authority, and that the alleged principal can be liable only if it had knowledge of the agent's representation and failed to repudiate it" and concluding that Great American "should bear the burden of monitoring the apparent authority of a putative agent").

Based on the undisputed facts regarding Great American's conduct, a reasonable person in the government's position would believe that Mr. Davis had the authority to issue the bonds at issue in this appeal. Thus, the trial court did not err in holding that there was no material factual dispute that "Great American's conduct demonstrated that [Mr.] Davis had authority to enter into these bonds." *Great Am. Ins.*, 791 F. Supp. 2d at 1349. *See Deere & Co. v. Int'l Trade Comm'n*, 605 F.3d 1350, 1357 (Fed. Cir. 2010) (principal may silently act in a manner that gives an agent a reasonable appearance of authority).

For the foregoing reasons, we affirm the trial court's determination that the bonds at issue were not unenforceable as exceeding Mr. Davis's alleged $1 million authority.

CONCLUSION

We affirm the Court of International Trade's grant of summary judgment in favor of the government, affirm its denial of the government's motion to amend the judgment to include prejudgment interest, reverse the denial of postjudgment interest, and remand.

No costs.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**