# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Seven Seas Shipchandlers, LLC | ) | ASBCA Nos. 57875, 57876, 57877 |
| | ) | 57878, 57879 |
| Under Contract Nos. W91B4L-09-P-0518 | ) | |
| W91B4L-09-P-0318 | ) | |
| W91B4L-09-P-0436 | ) | |
| W91B4L-09-P-0465 | ) | |
| W91B4L-09-P-0585 | ) | |

APPEARANCE FOR THE APPELLANT:    Joseph E. Schmitz, Esq.
                                 Schmitz & Socarras LLP
                                 McLean, VA

APPEARANCES FOR THE GOVERNMENT:  Raymond M. Saunders, Esq.
                                 Army Chief Trial Attorney
                                 Brian E. Bentley, Esq.
                                 Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE NEWSOM

In this appeal, we consider the question of which party bears the risk of theft of a cash payment intended for a contractor. The government tendered $240,549.90 in Afghan cash to Muhummad Qahir (Mr. Qahir), intended as payment on five of appellant's contracts. Mr. Qahir disappeared with the cash. The government argues that its payment obligation was fulfilled because Mr. Qahir possessed apparent authority to collect cash payments for the contractor. It contends that the contractor manifested assent to Mr. Qahir's apparent authority when it failed to object after Mr. Qahir twice collected cash payments. The contractor contends that Mr. Qahir had no authority to accept payment, and it brought claims seeking payment. We previously denied appellant's Motion for Partial Summary Judgment asserting that the government had not proved its affirmative defense that appellant was paid for its performance. 13 BCA ¶ 35,193, *recon. denied*, 13 BCA ¶ 35,288.

The parties waived hearing and submitted the case upon the record pursuant to Board Rule 11. Pursuant to the Board's 17 January 2012 Order, only entitlement is before the Board.

Having considered the briefs and record evidence, the Board holds that the government has not carried its burden to prove that it paid appellant. In the circumstances presented here, we conclude that apparent authority is not an issue for decision in this appeal. Appellant is entitled to payment from the government, plus applicable interest.

## FINDINGS OF FACT

1. These appeals arise out of five separate firm-fixed-price contracts awarded by the Kandahar Regional Contracting Center to Seven Seas between January and May 2009. The contracts required Seven Seas to deliver various supplies to Kandahar Air Field (KAF) in Afghanistan in 2009.

### The Five Contracts at Issue

2. Contract No. W91B4L-09-P-0318 (Contract 318), was awarded on 28 January 2009 and required Seven Seas to supply five generators at a total price of $96,429.65 (R4, tab 10). Contract No. W91B4L-09-P-0436 (Contract 436), awarded on or about 12 March 2009, required Seven Seas to supply information systems hardware at a total price of $14,442.45 (R4, tab 19). Contract No. W91B4L-09-P-0465 (Contract 465), awarded 28 March 2009, required Seven Seas to supply refrigerant line sets and thermostat wire at a total price of $2,483.30 (R4, tab 28). None of the first three contracts – neither Contract 318, Contract 436, nor Contract 465 – specified a method of payment (R4, tabs 10, 19, 28).

3. The last two contracts at issue did specify payment methods. On 23 April 2009, Contract No. W91B4L-09-P-0518 (Contract 518) was awarded, requiring Seven Seas to supply generators at a total price of $125,885.76 (R4, tab 1). Contract 518 contained two clauses addressing method of payment: (1) FAR 52.232-34, PAYMENT BY ELECTRONIC FUNDS TRANSFER – OTHER THAN CENTRAL CONTRACTOR REGISTRATION (MAY 1999); and (2) 952.232-0002, PAYMENT IN LOCAL CURRENCY (AFGHANISTAN) (MAR 2009) (*id.* at 7, 18).

4. FAR 52.232-34, PAYMENT BY ELECTRONIC FUNDS TRANSFER – OTHER THAN CENTRAL CONTRACTOR REGISTRATION (MAY 1999), required that "[a]ll payments by the Government under this contract shall be made by electronic funds transfer (EFT) except as provided in paragraph (a)(2) of this clause." If EFT did not work, Paragraph (a)(2) provided that the contractor agreed in advance to "[a]ccept payment by check or some other mutually agreeable method of payment." (R4, tab 1 at 7)

5. Clause 952.232-0002, PAYMENT IN LOCAL CURRENCY (AFGHANISTAN) (MAR 2009), granted the government discretion to pay the contractor by cash in Afghanistan currency; by check; or by various forms of electronic funds transfer. It provided, however, that if cash payment was made, the cash must be "dispersed in a manner prescribed by the U.S. Military Local Finance Office." (R4, tab 1 at 18-19)

6. Finally, on 3 May 2009, Contract No. W91B4L-09-P-0585 (Contract 585) was awarded, requiring Seven Seas to supply hardware at a total price of $1,338.74

2

(R4, tab 36). Contract 585 lacked FAR 52.232-34, but contained the same clause 952.232-0002, PAYMENT IN LOCAL CURRENCY (AFGHANISTAN) (MAR 2009), included in Contract 518 (*id.* at 8).

Arrangement to Pay Seven Seas in Cash

7. The facts concerning how cash payments came to be made to Seven Seas are critical to both parties' arguments, so we describe them in some detail. The government's KAF Commercial Vendor Services section (CVS) was the payment office that paid contractors such as Seven Seas (R4, tab 7 at 123). CVS cashiers dispensed money, and a Noncommissioned Officer-in-Charge (NCOIC) supervised the CVS and the cashiers (app. supp. R4, tab L, Leomiti (Leomiti dep.) at 59-60, 62, 101).

8. Initially during the relevant period, the CVS NCOIC was Sergeant (SGT) James P. Velasquez (R4, tab 7 at 123).

9. Seven Seas had been paid through EFT on other contracts, and it received at least nine EFT payments on unrelated contracts between January and 1 June 2009 (app. supp. R4, tab A). On 7 February 2009, however, SGT Velasquez offered to pay Seven Seas in cash, so that Seven Seas could avoid EFT transaction fees (R4, tab 7 at 123). SGT Velasquez's 7 February 2009 email stated: "[w]hen we EFT your payments you occur [sic] a fee because your bank is out of Afghanistan. If you can come into our office we can pay you in US Cash." (*Id.*)

10. SGT Velasquez did not identify a specific contract to which his 7 February 2009 offer to pay in cash would apply. However, he described the CVS as "the office that pays the contracts for Kandahar" (R4, tab 7 at 123), and as both parties assume that he meant it to apply to all contracts payments made by the KAF CVS, (gov't br. at 9; app. reply br. at 8), the Board finds that this cash payment arrangement was intended to apply to any contract paid through the KAF CVS during the relevant period.

11. Seven Seas operations executive, Sadiq Maruf (Mr. Maruf), accepted the offer to receive payments in cash. Significantly, he identified three individuals who were authorized to receive cash on behalf of Seven Seas. His 8 February 2009 email stated: "[a]s per your telecon with Mr. Andy, please note we will accept cash in US $. Kindly note the following personnel are authorized to collect cash from you." The three persons "authorized to collect cash" for Seven Seas were Raja Khan, Saeed Khan, and Shabbeer Bajwa. (R4, tab 7 at 122)

12. Mr. Maruf did not expressly authorize Mr. Qahir to accept payment for Seven Seas (R4, tab 7 at 122). Mr. Qahir was not a Seven Seas employee, although he was known to Seven Seas personnel (*id.* at 125, Declaration of Raja Khan (Khan decl.) ¶ 3).

3

First Cash Payment Dispensed to Mr. Qahir, Without Incident

13. Thereafter, despite that Seven Seas did not authorize Mr. Qahir to receive cash payments, on two occasions, the government dispensed cash payments to Mr. Qahir without incident. Both occurred on contracts not at issue in these appeals.

14. The first occasion occurred on or about 25 March 2009. Seven Seas contract administrator Raja Khan (Mr. Khan) asked Mr. Qahir to deliver an invoice to the contracting officer, Senior Airman Austin DeRose. (Khan decl. ¶ 4) Mr. Khan did not direct Mr. Qahir to go to the CVS nor obtain payment (*id.*).

15. Mr. Qahir exceeded those instructions and went to the CVS, where the government cashier gave him 4,693,973 in Afghan currency (approximately $90,000) intended as payment for Seven Seas (Khan decl. ¶ 4; R4, tab 7 at 135, Supplemental Declaration of Raja Khan (Khan supp. decl.) ¶ 4).

16. No immediate harm was done, as Mr. Qahir delivered this cash to Seven Seas (Khan decl. ¶ 4; Khan supp. decl. ¶ 4).

17. The parties expend considerable effort disputing whether or not Seven Seas complained to the government about this 25 March 2009 cash payment. Seven Seas contends that its executive telephoned the contracting officer and expressed concerns (R4, tab 7 at 132-33, Declaration of Sadiq Maruf (Maruf decl.) ¶ 4). The contracting officer denies receiving that call (supp. R4, tab 2 at 1, Declaration of Austin DeRose (DeRose decl.) ¶ 2).

18. Despite their differences, both parties' versions converge in agreement that Seven Seas *did not complain to the government about the tendering of payment to Mr. Qahir*, nor did it complain about having been paid in cash. Rather, at most, Mr. Maruf complained about being paid in *Afghan* currency. He invited payment by "US Dollars cash" and mentions no complaint about the fact that payment was dispensed to Mr. Qahir. (Maruf decl. ¶ 4)

New CVS Staff Takes Over and New NCOIC is Informed of the Individuals Authorized to Collect for Seven Seas

19. Meanwhile, in April 2009, a new payment team transitioned into the CVS. A new NCOIC, SFC Christina Leomiti (SFC Leomiti) (also known as Staff Sergeant Wilson), replaced SGT Velasquez. About a month later, either in late April or early May 2009, Private First Class (PFC) Jason Yost (PFC Yost) joined the CVS staff as a cashier. (Leomiti dep. at 241)

20. Significantly, when SFC Leomiti took over as NCOIC, her predecessor gave her the names of the three individuals authorized to collect cash for Seven Seas,

4

none of whom was Mr. Qahir. SFC Leomiti testified that she understood that there was "a list of personnel that was authorized to pick up" money for Seven Seas and that only "Mr. Raja Kahn, Mr. Saeed Khan, and Mr. Sagir Bhujwa" were its "trusted agents" for collection of cash payments. (Leomiti dep. at 117, 122-23, 131-32)

Second Cash Payment Dispensed to Mr. Qahir, Without Incident

21. On 27 May 2009, the CVS again tendered a cash payment to Mr. Qahir on unrelated contracts (Khan supp. decl. ¶ 4; Maruf decl. ¶ 7). As on the previous occasion, Mr. Khan requested Mr. Qahir to deliver invoices to the contracting officer, and again Mr. Khan exceeded those instructions, went to the CVS and collected money, this time totaling approximately 807,160 in Afghan currency (about $13,000) (id.).

22. As before, no immediate harm occurred; Mr. Qahir turned this cash over to Seven Seas (Maruf decl. ¶ 7).

Again, Seven Seas Does Not Complain

23. After receiving the cash from Mr. Qahir on 27 May 2009, Mr. Khan notified Mr. Maruf, who instructed Mr. Khan to remind the contracting officer that Seven Seas did not wish to be paid in Afghan cash (Maruf decl. ¶ 7). Again, Mr. Maruf did not complain about payments to Mr. Qahir, nor did he complain about cash payment so long as the cash was in U.S. currency.

24. Mr. Khan did not pass that instruction along to the contracting officer. On 6 June 2009, the contracting officer notified Mr. Khan that the command had determined to stop making cash payments to vendors and instead make all contract payments through EFT (Khan supp. decl. ¶ 5; DeRose decl. ¶ 4). As a result, Mr. Khan believed that "no further instructions to [the government] were necessary in order to avoid any repeat of the two [prior] inciden[ts]" (Khan supp. decl. ¶ 5).

25. Thereafter, the parties began to arrange payments through EFT (R4, tab 7 at 127-28, 138; Maruf decl. ¶¶ 7, 8; DeRose decl. ¶ 4).

Conflicting Theories About How Cash Was Tendered to Mr. Qahir

26. Neither party presented convincing evidence as to how or why the cashiers dispensed cash to Mr. Qahir on 25 March or 27 May 2009, in contravention of Mr. Maruf's 8 February 2009 email limiting those authorized to accept cash for Seven Seas. Seven Seas theorizes that when Mr. Qahir collected cash from the CVS, each time he was accompanied by the contracting officer (app. reply br. at 6, 8). The evidence does not support this contention. Seven Seas' support consists of statements

5

from individuals without personal knowledge of the transactions.[1] The contracting officer – who has personal knowledge – denied accompanying Mr. Qahir to the CVS to collect payments (app. supp. R4, tab J at 2, admission 2). The Board finds that the contracting officer did not accompany Mr. Qahir to the CVS on either occasion.

27. Similarly, a finding in a Defense Criminal Investigative Service (DCIS) investigative report states that Mr. Qahir accompanied other Seven Seas employees to the CVS when those other employees collected payments (app. supp. R4, tab S at A-2, ¶ 4), creating the impression that Mr. Qahir also had authority to collect payments.[2] The Board does not credit this DCIS report finding, because its source, SFC Leomiti, disputed the finding during her deposition. SFC Leomiti testified that she observed Mr. Qahir in the CVS on only one occasion prior to the theft, and on that occasion, no money was collected (Leomiti dep. at 175-76, 222-23). Accordingly, the Board finds that Mr. Qahir did not accompany Seven Seas personnel to the CVS on previous occasions when they collected cash payments. The Board finds that the only two occasions in which Mr. Qahir collected cash payments from the CVS for Seven Seas, aside from the theft on 9 June 2009, occurred on (or about) 25 March 2009 and on 27 May 2009, and that he was unaccompanied on both occasions.

Seven Seas Performed the Contracts

28. Seven Seas delivered the supplies required by all five contracts (R4, tabs 4, 11, 21, 31, 37, DD Form 250 – Material Inspection and Receiving Reports). The government does not dispute that Seven Seas was entitled to payment on the contracts.

---

[1] Mr. Khan's initial declaration stated that the contracting officer accompanied Mr. Qahir to the CVS, but clearly Mr. Khan did not personally observe the transactions. He later clarified that he had "assumed" the contracting officer was present (Khan supp. decl. ¶ 4). Another Seven Seas employee stated "to the best of my recollection" Mr. Qahir told him that the contracting officer was present (app. supp. R4, tab C, Declaration of Shabbeer Saeed Bajwa ¶ 6(b)). The Board finds the contracting officer more reliable than statements by those who did not personally observe the transactions.

[2] The DCIS report was admitted under the Board's rules, as neither party objected to it, but the Board accords little or no weight to its findings. Several of its findings appear to be overstatements or errors. The report attributes statements to SFC Leomiti that she denied making (Leomiti dep. at 187, 223-24, 228-29). The report also does not acknowledge or reconcile its findings with contrary evidence. For example, its finding that Seven Seas did not notify the government "that Qahir was not authorized to pick up payments" (app. supp. R4, tab 5 at A-2, ¶ 4) conflicts with Mr. Maruf's 8 February 2009 email identifying persons who had that authority (R4, tab 7 at 122).

6

The Theft on 10 June 2009

29. On 10 June 2009, the theft occurred. This time, there is some evidence of what happened.

30. In contrast to the prior occasions, this time Mr. Khan did not ask Mr. Qahir to deliver invoices (Khan supp. decl. ¶ 8). Mr. Qahir went to the facility on his own initiative.

31. SFC Leomiti was on duty at the CVS on 10 June 2009 (Leomiti dep. at 173). Her duties included supervising the cashiers who disbursed cash (*id.* at 59-60, 62, 101).

32. SFC Leomiti described the payment process then in effect. Prior to paying a contractor, the NCOIC reviewed and signed a payment voucher, SF 1034 (Leomiti dep. at 99-100). The NCOIC's signature indicated that the payment was "correct in our system" (*id.* at 100). The NCOIC then gave the SF 1034 to the cashier who "deals with the customer and disburse the cash" (*id.* at 99-100).

33. The payee on the voucher was required to be the person listed on the contract (Leomiti dep. at 92). To collect cash, a person was required to present a picture identification to the cashier (*id.* at 96-98). The cashier was required to review the person's identification to verify his identity before dispensing cash (*id.* at 98, 101).

34. SFC Leomiti saw Mr. Qahir at the CVS on 10 June 2009, but at the time, SFC Leomiti "didn't know who he was" (Leomiti dep. at 174, 189-90).

35. PFC Yost was the cashier who dispensed cash to Mr. Qahir on 10 June 2009 (Leomiti dep. at 184-85). SFC Leomiti generally did not stand behind the cashiers to observe what they did with customers, and she did not do so 10 June 2009 (*id.* at 101, 210-11). She did, however, see Mr. Qahir receive cash from PFC Yost (*id.* at 188-90).

36. SFC Leomiti did not know if PFC Yost checked Mr. Qahir's identification before dispensing cash to him (Leomiti dep. at 190). There is no direct evidence as to whether or not PFC Yost checked Mr. Qahir's identification, and the record contains no statement from PFC Yost.

37. PFC Yost dispensed to Mr. Qahir $240,549.90 in Afghan cash as payment on the following five Seven Seas' contracts in the following amounts:

7

a. Contract 585:      $1,338.74;
b. Contract 518:      $125,855.76;[3]
c. Contract 318:      $96,429.66;
d. Contract 436:      $14,442.45;
e. Contract 465:      $2,483.30.

(R4, tab 7 at 158, tabs 2, 14, 22, 32, 40, SF 1034s)

38. After the transaction, SFC Leomiti received the SF 1034s from the cashier (Leomiti dep. at 191).

39. Mr. Qahir disappeared with the cash and was not seen again (R4, tab 7 at 141, Declaration of Anarbol "Andy" Peña (Peña decl.) ¶ 8).

40. By mid-August 2009, Seven Seas noticed that payment for Contract 318 was overdue, and Mr. Khan contacted SFC Leomiti (R4, tab 7 at 155). SFC Leomiti initially responded that she believed payment had been made to a Seven Seas employee (Leomiti dep. at 207-08).

41. Mr. Khan followed with an email attaching a picture of Mr. Qahir, asking if he was the individual to whom the government delivered the payment. SFC Leomiti responded, "That is correct! That is the individual who picked up money for Seven Seas." (R4, tab 7 at 155, 160; Leomiti dep. at 201) Further email exchanges over the subsequent days confirmed that Mr. Qahir had collected payments for all five Seven Seas contracts (R4, tab 7 at 158-59). SFC Leomiti said that PFC Yost also recognized Mr. Qahir as the person who collected payment (Leomiti dep. at 202-03).

42. Seven Seas reported the theft to government investigative authorities (Peña decl. ¶ 12). When the vouchers were reviewed after the theft, they showed that Mr. Qahir signed the name "Raja"– apparently referring to Mr. Khan, a Seven Seas contract administrator (R4, tab 2 at 2, tab 14 at 2, tab 22 at 2, tab 32 at 2, tab 40 at 2, SF 1034s). Mr. Khan was one of the three individuals authorized to collect cash for Seven Seas (R4, tab 7 at 122). Accordingly, the Board finds Mr. Qahir forged Mr. Khan's signature on the vouchers.

43. Because of the forgery, the Board finds it more likely than not that PFC Yost failed to verify the identification of Mr. Qahir before dispensing cash to him.

---

[3] Minor discrepancies totaling $30.01 exist between the contract values and amounts paid out on Contracts 518 and 318. Contract 518 was awarded in the amount of $125,885.76 (R4, tab 1), but the public voucher shows that $125,855.76 was paid out (R4, tab 2), a $30 discrepancy. Contract 318 was awarded in the amount of $96,429.65 (R4, tab 10), but the public voucher shows that $96,429.66 was paid out (R4, tab 14), a $0.01 discrepancy.

44. The contracting officer did not state in his declaration whether or not he was aware, prior to the theft, that Mr. Qahir had collected money for Seven Seas, nor does it state whether or not he believed Mr. Qahir to have authority to accept payments for Seven Seas (DeRose decl.).

45. DCIS conducted an investigation and concluded that the matter should be handled by local Afghan authorities, because the government viewed the loss as Seven Seas', not the government's (supp. R4, tab 1 at A-2).

46. Seven Seas submitted five certified claims to the contracting officer, each dated 1 September 2011, seeking payment for Contracts 318, 436, 465, 518, and 585 (R4, tabs 7, 8, 17, 26, 34, 42). We infer from the contractor's seal that the claims were sent on 5 September 2011 (*id.*). Allowing three days for transmission by mail, we conclude that the contracting officer received them on 8 September 2011. The value of the claims totaled $240,579.90, broken out as follows:

| Contract | Claim Amount |
|----------|-------------|
| 318 | $ 96,429.65 |
| 436 | $ 14,442.45 |
| 465 | $ 2,483.30 |
| 518 | $125,885.76 |
| 585 | $ 1,338.74 |
| Total | $240,579.90 |

(*Id.*) The contracting officer issued final decisions, dated 8 October 2011, denying each of the claims (R4, tabs 9, 18, 27, 35, 43). Appellant timely appealed to this Board.

DECISION

These appeals turn on whether the government fulfilled its payment obligation to appellant when it tendered $240,549.90[4] in Afghan cash to Mr. Qahir on 10 June 2009. As the government concedes (gov't br. at 8), the government bears the burden to prove that it paid appellant. *S.A.S. Bianchi Ugo fu Gabbriello*, ASBCA No. 53800, 05-2 BCA ¶ 33,089.

The government argues based on common law agency principles that by dispensing cash to Mr. Qahir, it fulfilled its payment obligation to Seven Seas. The government acknowledges that Seven Seas' operations executive, Mr. Maruf, did not expressly authorize Mr. Qahir to collect cash for Seven Seas, and there is no dispute that Mr. Qahir lacked actual authority to collect payment for Seven Seas (gov't reply

_____

[4] It appears that the government may have tendered approximately $30 less than the total combined contract values (*see* findings 37, 46).

9

br. at 6-7).

Rather, the government contends that Mr. Qahir had apparent authority to accept cash for Seven Seas. Apparent authority is established when a third party reasonably believes the actor to possess authority to act for the principal. RESTATEMENT (THIRD) OF AGENCY § 2.03 (2006) (hereinafter Restatement); *United States v. Great American Insurance Company of New York*, 738 F.3d 1320, 1334 (Fed. Cir. 2013) (hereinafter *Great American*). The Restatement defines apparent authority as:

> [T]he power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.

Restatement § 2.03. Because its pay office twice dispensed cash to Mr. Qahir without objection from Seven Seas, the government argues that it was reasonable for government payors to believe that Mr. Qahir had become an authorized recipient of cash on behalf of Seven Seas.[5]

While it is troubling that Seven Seas did not alert the government to concerns about Mr. Qahir, we find the government's theory of apparent authority inapposite. First, there is no evidence that anyone in the government actually formed a belief that Mr. Qahir possessed authority to collect cash for Seven Seas. The government provided no testimony or declaration from PFC Yost, the cashier who dispensed cash to Mr. Qahir, and the contracting officer was silent about his perception of Mr. Qahir's authority. (Findings 36, 44) The only government employee to offer testimony on this subject – CVS NCOIC SFC Leomiti – testified that she knew that Mr. Qahir was not among those authorized to accept cash for Seven Seas (finding 20).

Second, the service members staffing the CVS on 10 June 2009 likely were unaware of the prior occasions when Mr. Qahir picked up cash for Seven Seas. The CVS NCOIC testified that she saw Mr. Qahir on 10 June 2009 but did not know who he was, and that the one prior occasion when she had seen Mr. Qahir, he did not pick up any money. (Findings 27, 34) Again, no testimony or statement was provided from the cashier, PFC Yost, who entered service in the CVS in late April or May 2009 (findings 19, 36). There is no evidence that he was aware of either prior payment, and it is a fair inference that he was unaware of at least the March 2009 transaction, which predated his deployment. Again, the contracting officer was silent (finding 44).

The evidence instead supports the conclusion that the government paid

---

[5] Seven Seas contends that it objected to the payments to Mr. Qahir, but the Board finds that Seven Seas did not object (findings 18, 23, 24).

10

Mr. Qahir because Mr. Qahir forged Mr. Khan's signature on the SF 1034 payment vouchers (findings 42-43). The CVS cashier was required to review the payee's identification before dispensing cash (findings 32-33), but we find it more likely than not that he failed to do so (findings 35-43). Stated differently, the cashier paid Mr. Qahir not because he recognized Mr. Qahir and believed him to have authority, but because Mr. Qahir pretended to be someone else who was authorized to receive payment.[6]

This conclusion is reinforced by language in two of the contracts. Both Contracts 518 and 585 contained local clause 952.232-0002, PAYMENT IN LOCAL CURRENCY (AFGHANISTAN) (MAR 2009), which gave the government discretion to pay by Afghan cash. While the clause did not specify to whom cash may be dispersed, it provided that cash must be "dispersed in a manner prescribed by the U.S. Military Local Finance Office" (finding 5). We conclude the government did not follow its own processes by confirming the identity of the person to whom it dispensed cash.

## CONCLUSION

In summary, the government failed to sustain its burden to prove that it paid Seven Seas. Because Seven Seas has performed the contracts (finding 28) and has not been paid, the Board holds that Seven Seas is entitled to payment of $240,579.90 on the contracts plus applicable interest from 8 September 2011, the date the contracting officer received the claims (finding 46).

Dated: 4 March 2015

ELIZABETH W. NEWSOM
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

[6] These findings distinguish this case from *Great American*, 738 F.3d at 1335, wherein the Federal Circuit held that a surety conferred apparent authority by repeatedly failing to object when its agent issued bonds for values exceeding his authorized limit. Here, unlike in *Great American*, a forgery and the government's failure to follow its payment procedures – not a belief about Mr. Qahir's authority – is what led the government to dispense cash to Mr. Qahir.

I concur                                    I concur

_____                    _____
MARK N. STEMPLER                           RICHARD SHACKLEFORD
Administrative Judge                       Administrative Judge
Acting Chairman                            Vice Chairman
Armed Services Board                       Armed Services Board
of Contract Appeals                        of Contract Appeals


        I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 57875, 57876, 57877,
57878, 57879, Appeals of Seven Seas Shipchandlers, LLC, rendered in conformance
with the Board's Charter.

        Dated:


                                    _____
                                    JEFFREY D. GARDIN
                                    Recorder, Armed Services
                                    Board of Contract Appeals