ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --                                  )
                                              )
Horton Construction Co., Inc.                 )       ASBCA No. 61085
                                              )
Under Contract No. W9124E-11-C-0021           )

APPEARANCE FOR THE APPELLANT:         Gregory D. Coleman, Esq.
                                        Johnson Hopewell Coleman, LLC
                                        Decatur, GA

APPEARANCES FOR THE GOVERNMENT:       Scott N. Flesch, Esq.
                                        Army Chief Trial Attorney
                                       MAJ Sean B. Zehtab, JA
                                       ChristinaLynn E. McCoy, Esq.
                                        Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE OSTERHOUT

        Horton Construction Co., Inc. (Horton or appellant), appeals the decision by the
United States Army (Army or the government) denying Horton's claims for
compensation due to a significant reduction in the amount of concrete to be crushed
under a contract for concrete crushing and erosion control projects. In addition to a
defense on the merits, the Army claims Horton signed a final release of these claims,
although Horton counters that the employee who signed the release was not authorized
to do so, invalidating the release. For the reasons discussed below, we hold that
Horton executed an effective release and deny the appeal.

FINDINGS OF FACT

        1. On September 12, 2011, the Army awarded Contract No. W9124E-11-C-0021
(the contract) to Horton, with a total value of $1,943,148.51 (R4, tab 30 at 479-80). The
contract incorporated by reference FAR 52.236-2, DIFFERING SITE CONDITIONS
(APR 1984) and FAR 52.243-5, CHANGES AND CHANGED CONDITIONS
(APR 1984) (R4, tab 1 at 43-44). Contract Line Item Number (CLIN) 0001 of the contract
allocated $1,918,211.76 for concrete crushing and erosion control projects. However, the
contract did not specify how much of this fund was for concrete crushing and how much
was for erosion control projects, and used dollars to be spent as the unit identified. (R4,
tab 30 at 481) Paragraph 5.2.1 of the Performance Work Statement provided only
"approximately 69,000 Tons of concrete" to be crushed (id. at 488).

2.  Johnny Horton, Sr., appellant's president, signed the contract for Horton in blocks 30A and 30B.  Block 30A stated "NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN."  Block 14 identified "Horton Construction Co., Inc., Chauncy Horton" as the name of the offeror, since Chauncy Horton had submitted the proposal pursuant to Johnny Horton, Sr.'s approval.  Johnny Horton, Sr. did not change Chauncy Horton's name on the contract when he signed the forms.  (*Id.* at 480; tr. 2/52-55)

3.  During the hearing, several of appellant's employees testified about Chauncy Horton's position within the company.  When asked, Chauncy Horton rated himself lateral to Johnny Horton, Jr., in some situations, though Chauncy Horton was somewhat equivocal on this issue and also described himself as lower than Johnny Horton, Jr. (tr. 2/83-85, 99-100).  Regardless of whether Chauncy Horton was lateral or lower, Johnny Horton, Jr., had medical issues that kept him from working for Horton during most of the performance of this contract and Chauncy Horton covered many of the duties that Johnny Horton, Jr., typically performed (tr. 2/100).  Johnny Horton, Jr., was generally agreed to be a vice president, (*id.* at 84-85; tr. 1/164-65), though this position appeared to have no more power than Chauncy Horton had as a project manager (tr. 1/181-82, 2/30, 83-84).  Chauncy Horton also testified that he was never a corporate officer (tr. 2/47).  Dominique Washington testified that Chauncy Horton also had no authorization and was below Johnny Horton, Jr., though admits no description of his duties was written anywhere (tr. 1/183, 2/26-27, *accord* tr. 2/99) ("Q:  You [Chauncy Horton] never had a written duty description?  A:  No."); (*see also* tr. 1/190) (Dominique Washington calling Chauncy Horton a Project Manager), (R4, tab 6 at 63) (Chauncy Horton signing as Project Manager).  Johnny Horton, Jr., did not seem to know Chauncy Horton's title when asked (ex. K at 14).

4.  Each employee testified that almost all, if not all, authority in the company rested with Johnny Horton, Sr., the president (tr. 1/157) (Brandon Horton stating Johnny Horton, Sr., "kind of held all the power and he let it be known that I am Horton Construction."); (tr. 1/162) ("whatever he says that's how it goes"); (tr. 2/21-23) (Dominique Washington affirming all contractual matters, estimates, final decisions, and major changes went through Johnny Horton, Sr.); (tr. 2/86) (Chauncy Horton stating Johnny Horton, Sr., "was the judge, jury, verdict.  Like he was the law"); (tr. 2/100; ex. K at 63-64, 68-69, 72-74, 88-89, 92-93).[1]  Witnesses also consistently testified that any authorizations Johnny Horton, Sr., released to his employees were transaction-specific and conveyed verbally (tr. 1/188-90, 2/26, 40, 54; ex. K at 43, 50).  Despite this, appellant's employees also testified, and we so find, that they had

---

[1] Johnny Horton, Sr., passed away after the contract closed out but before Horton filed the appeal.  Thus, we must rely on the employees' testimony of their responsibilities instead of hearing from Johnny Horton, Sr., directly.

authority to run operations day to day and, in some instances, had purchasing power and power over other substantive matters (tr. 1/117, 119, 133, 139-41, 2/22, 28-29, 86, 100, 119, 152; ex. K at 35, 42). Chauncy Horton testified that one of his duties was to decide whether he could sign a document or Johnny Horton, Sr., needed to see a document requiring signature (tr. 2/103). Further, appellant's employees also agreed that they never communicated this organizational authority structure or individual employees' limited authority to the government (tr. 1/37, 150, 194-95, 2/27, 35, 87, 103-04, 119, 135, 151; ex. K at 37, 43) (Johnny Horton, Jr., stating appellant didn't inform the government of its authority structure because "[t]hey wouldn't have to [know]") (*id.* at 44). Therefore, we find appellant did not delineate the limits of Chauncy Horton's authority to sign contractual documents to the government.

5. Appellant registered both Johnny Horton, Sr., and Chauncy Horton as contacts within the Central Contractor Registration (CCR) system (R4, tab 29 at 477). The purpose of this system was to establish points of contact for government contractors across all of their contracts (tr. 2/180). Appellant's staff updated these entries annually, with Johnny Horton, Sr.'s approval (tr. 2/39-40, 149-50). In addition to his identification as a point of contact in contractual documentation, Chauncy Horton served as the central point of contact with the government for this particular contract (tr. 1/37, 56, 83, 149-50, 159, 2/176-77, 180). Multiple witnesses testified that Johnny Horton, Sr., had very limited direct interaction with the government, and did not sign documents directly (tr. 1/56, 83, 2/152, 166-67, 174-76). Testimony indicated he was present at some initial meetings with other employees, but no documentation of the dates those meetings took place or what was done at them was presented or provided in the record (tr. 2/35).

6. During a pre-bid meeting, staff from appellant, a subcontractor, and the government were on site and discussed that only "about 20,000" tons of concrete were at the site. When appellant raised this issue, a Project Manager with the government stated that there would be more concrete brought to the site as the contract progressed. (Tr. 1/109-10, 2/48-51; ex. K at 38-39) Johnny Horton, Jr., testified that several of appellant's employees frequently but informally brought up the issue of the extra concrete during performance of the contract (ex. K at 119-21).

7. After award of the contract to appellant, the government issued a Notice to Proceed on September 20, 2011, which Chauncy Horton signed on the line reading "Signature of Authorized Official" (R4, tab 34 at 249). Chauncy Horton reportedly received authorization to sign this document from Johnny Horton, Sr. (ex. K at 55).

8. During performance of the contract, Chauncy Horton handled the collection of invoices and, with a subordinate employee, was frequently on site (tr. 1/161, 2/36-37, 90). He also communicated to the government designs for erosion control projects created by a subcontractor early in the contract (R4, tab 35 at 326; tr. 2/111-13).

9. The record indicates that 8,000-9,000 additional tons of concrete arrived by June 2012, but it is unclear how much of this appellant eventually crushed (R4, tab 15 at 133, 136, tabs 52-53; tr. 2/94-95). Horton considered the contract to be approximately one-third rock crushing and two-thirds erosion control and landscaping even though both types of work were contained within one CLIN (tr. 1/30). The government considered modifying the contract to use more of the remaining funds for erosion control projects as early as February 1, 2012 (R4, tab 39). Chauncy Horton communicated to the government that he believed no contract modifications would be necessary to accomplish this, and provided an estimate for the projects (*id.* at 595,[2] 603; tr. 2/125-30).

10. By email dated January 13, 2012, Chauncy Horton provided the government a breakdown for concrete crushing and erosion control. He stated it was appellant's intent to "produce 70,000 tons of crushed material and perform the erosion control tasks as specified by the government on each case. The [sic] included breakdown delivers the crushed rock at a rate of $20.69/ton." (App. supp. R4, tab 104 at 1) After negotiation via emails between the government's contract specialist and Chauncy Horton, both parties arrived at a rate of $18.93/ton on January 20, 2012 (R4, tab 7 at 96; *see also* tab 5 at 56, 58; app. supp. R4, tab 105).

11. By email dated January 27, 2012, Chauncy Horton requested "that the rate of production be adjusted so that our costs can be recovered," as only 30,000 tons of concrete were available to be crushed, rather than the approximated 69,000 tons (R4, tab 8 at 100). The contracting officer (CO) denied this request by correspondence dated February 1, 2012. She pointed out that the contract "plainly" stated there was "approximately" 69,000 tons of concrete, which she viewed as an estimate only. She also noted that the contract did not end until June, and more concrete could be added in that time. (R4, tab 9 at 102)

12. Through the course of the contract, Chanucy Horton signed several modifications on behalf of appellant. Modification No. 1 altered the Statement of Work, and contained the following language: "This modification does not incur any additional cost to the Government. . . . RELEASE OF CLAIMS. Contractor unconditionally waives any charge(s) against the Government arising under the revised statement of work of this contract." Chauncy Horton signed this modification on January 25, 2012. (R4, tab 6 at 63) Modification No. 3, signed by Chauncy Horton on June 29, 2012, was "issued to extend the ending period of performance to August 29, 2012 due to excusable delays at no additional cost to the Government," and contained

---

[2] The Board notes that there are two sets of bates-labeled page numbers on this tab, and will use the lower numbers contained therein.

almost identical[3] release language to Modification No. 1 (R4, tab 13 at 126). Modification No. 4 extended the period of performance to September 5, 2012, contained release language identical to Modification No. 3, and was signed by Chauncy Horton on August 29, 2012 (R4, tab 14 at 129). Chauncy Horton testified, and we so find, that he had authority to sign the modifications (tr. 2/87).

13. By email dated November 8, 2012, the government's contract specialist emailed Chauncy Horton and a subordinate employee with the subject line "Rock Crushing Contract Final Payment." The email read, in its entirety, "[p]lease fill out 'Release of Claims' form and send it to me. Please see attached approved payment request. Thank you." (R4, tab 63 at 729) She testified "[a]s a part of our process we have to have the final release of claim[s] to have the contractor paid" (tr. 2/182).

14. The attached form's heading read "CERTIFICATION OF FINAL PAYMENT" and "CONTRACTORS RELEASE OF CLAIMS" and had two lines for signatures of witnesses. It contained the following language:

> [T]he contractor, upon payment of the said sum by the
> United States of America . . . does remise, release, and
> discharge the Government, its officers, agents, and
> employees, of and from all liabilities[,] obligations, claims,
> and demands whatsoever under or arising from the said
> contract, other than claims in stated amounts as listed
> below.

Nothing is written below this text in the relevant field. Chauncy Horton signed and dated the form November 12, 2012. In the witness fields are signatures of Brandon Horton with the title of Estimator, and Dominique Washington with the title of Secretary, both employees of appellant. (R4, tab 16 at 138)

15. Brandon Horton testified that Chauncy Horton asked him to sign the release as a witness, and that he did so without reading it, as he typically relied on Chauncy's review of the document (tr.1/163). Dominique Washington testified that she also signed the form without reading it, as she was new to the company and unfamiliar with the contract closing process (tr. 1/189-92). Both witnesses agreed that Chauncy Horton did not have freestanding authority to sign such a document (*id.*; tr. 1/164). Chauncy Horton, for his part, testified that he understood it to only be a "prerequisite to collecting the funds," having read just "[p]arts of it" (tr. 2/88). He stated further that he would have gone to Johnny Horton, Sr., and suggested they get

---

[3] Modification No. 3 released claims arising under the "change in the period of performance" instead of under the "revised statement of work" that the government wrote in Modification No. 1.

legal advice, if he had understood the document to release all claims (tr. 2/89).  This document was executed within the home office where all of these employees, as well as Johnny Horton, Sr., worked (tr. 1/167-68).

16.  Chauncy Horton emailed the contracting specialist on November 15, 2012, requesting the following clarification for the form:  "Should the dollar amount listed on the release of claims reflect the total amount of the contract or the final amount paid . . . ?"  The email bore the subject line "Claims Release."  (R4, tab 65 at 737)

17.  The final invoice was paid on November 27, 2012 (R4, tab 17).  Funds that were left on the contract, totaling $17,747.27, were de-obligated from the contract on February 25, 2014, via Modification No. 5.  This included $3,900.60 in assessed liquidated damages and $13,846.67 in unused funds.  This modification included a release of claims provision, which reads as follows:  "The Contractor unconditionally waives any further charge(s) for work performed under this modification over and above those charges included and agreed to, which are directly associated with the de-obligation of unused funds listed in this contract modification."  (R4, tab 18 at 144)  Modification No. 5 was signed by Chauncy Horton on March 5, 2014 (*id.* at 145).

18.  At the hearing, the contracting officer testified that she never interacted with Johnny Horton, Sr.  She also testified that she never had a need to interact with him.  On cross-examination, she testified that she did not believe anyone in her office had interacted with him and that she was certain that the contracting officer who initially wrote the contract and the contract specialist had not interacted with Johnny Horton, Sr.  (Tr. 2/166-67)

19.  The contract specialist also testified at the hearing.  Throughout the contract, the contract specialist only interacted with Chauncy Horton and a subordinate Horton employee (tr. 2/174).  Chauncy Horton never told the government he did not have authority to sign documents (tr. 2/175).  When the contract specialist asked the subordinate employee if he could sign a modification, he answered that Chauncy Horton would need to sign the modification (tr. 2/177).  The contract specialist never met and never talked to Johnny Horton, Sr., although she regularly conducted business with Chauncy Horton (tr. 2/179).

20.  Appellant filed a claim for $274,599.00 by letter dated May 27, 2016, claiming it only crushed 28,997 tons of the contract's original estimated 69,000 tons of concrete (R4, tab 27 at 174).  By letter dated December 16, 2016, the contracting officer denied the claim (R4, tab 28 at 278, 284).  Appellant timely appealed the decision to the Board by letter dated March 8, 2017.

21.  The Board docketed the appeal as number 61085.

6

22.  The Board held a hearing on the merits of this appeal on March 18-19, 2019, in Lake Charles, Louisiana.

## DECISION

### I.  *The Parties' Arguments*

Appellant seeks compensation for lack of concrete at the site under several legal theories which we do not address in detail here because we resolve this appeal on the waiver issue advanced by the government.  That argument is that appellant waived its right to appeal when Chauncy Horton signed a final release.  (Gov't br. at 17)  The government argues that appellant did not reserve any claims in the final release, which Chauncy Horton had at least apparent authority to sign, and which released all claims without any reservations.  (Gov't br. at 17-21, 23-31)  Appellant argues the government has not met its burden to demonstrate that Chauncy Horton had actual or apparent authority to sign the final release.  (App. br. at 21-24; app. reply br. at 6-18)  Appellant argues, without factual or legal support, that signatures on modifications to the contract, which Chauncy Horton was authorized to sign, were "not acts that naturally r[o]se to the level of authority necessary for the signing of a Final Release," as the mods "often arose in the course of daily operations and had no financial consequence."  (App. reply br. at 8)

### II.  *Horton Released Its Claims*

#### A.  *A Valid Release has the Effect of Precluding Claims*

Appellant's signing a final release as well as several releases during performance of the contract dispose of this appeal.  When a release is clear, unequivocal, and unconditional, the release "must be given its plain meaning and effect."  *New Iraq AHD Co.*, ASBCA No. 59304, 15-1 BCA ¶ 35,849 at 175,292 (citing *Bell BCI Co., v. United States*, 570 F.3d 1337 (Fed. Cir. 2009)).  When such a release exists, it "bars any and all claims for additional compensation based upon events occurring prior to the execution of the release."  *New Iraq AHD*, 15-1 BCA ¶ 35,849 at 175,292 (citing *Todd Pacific Shipyards Corp.*, ASBCA No. 55126, 08-2 BCA ¶ 33,891 at 167,759).

Here, the government asserts that appellant signed several releases (gov't br. at 23-31).  Chauncy Horton, in fact, did sign several modifications that contained releases (findings 12, 17).  Further, and more importantly, he signed a final release before receiving final payment (finding 15).  Thus, any claims for additional compensation should be barred if his signature bound appellant.

7

However, appellant disputes the final release signature, arguing that Chauncy Horton, lacked the authority to sign the release (app. br. at 21-24). For the reasons set forth below, we disagree. Thus, the release is valid and additional claims for compensation are barred.

### B. *Chauncy Horton Possessed Authority To Sign The Releases*

#### 1. *Actual Authority*

Appellant argues that "[t]he government did not meet its burden to show that Chauncy Horton, Project Manager for Horton Construction, had the requisite authority to sign a Final Release" (app. br. at 21). The government argues that the evidence demonstrates that Chauncy Horton did possess such authority, as demonstrated by the evidence of how business was typically conducted by appellant and what appellant's employees did in this matter (gov't br. at 26-28). We agree with the government that Chauncy Horton had actual authority to sign the final release, as demonstrated below.

"A principal may give his agent express authority only by express form of communication." *Strann v. United States*, 2 Cl. Ct. 782, 789 (1983) (citing *Restatement* (*Second*) *of Agency* § 7 (1958)). Though appellant now seeks to disavow such authority having been granted, the circumstantial case that Johnny Horton, Sr. conferred such authority upon Chauncy Horton is quite strong. First, Chauncy Horton was listed as the offeror on the proposal, which is consistent with his having the authority to bind appellant contractually. Relatedly, in block 14 of the contract, itself, executed by Johnny Horton, Sr., Chauncy Horton was expressly named in the offeror box (finding 2), which implies that Mr. Horton, Sr., had expressly agreed to Chauncy Horton's role in contract administration.

Second, Johnny Horton, Sr., assigned Chauncy Horton to be his back up, which authorized Chauncy Horton to act on behalf of the contract. While Johnny Horton, Jr., was the unofficial vice president of the company and was sometimes seen as Chauncy Horton's superior, appellant had Chauncy Horton act in Johnny Horton, Jr.'s place during the bulk of the performance of this contract, making Chauncy Horton effectively a vice president of the company (finding 3). Even during times when Johnny Horton, Jr., was present, appellant designated both Johnny Horton, Sr., and Chauncy Horton as contractual points of contact in the CCR and updating it annually (finding 5). Thus, as publicly announced and repeatedly affirmed, Chauncy Horton had express authority to act in contractual matters for appellant.

Third, Chauncy Horton signed several contractual documents during performance of the contract and testified that he had authority to sign those documents (findings 7-8, 12). He signed the notice to proceed in the space labeled "Signature of Authorized Official" (finding 7). And he signed Modifications Nos. 1, 3, and 4, all of which

contained release of claims statements (finding 12). Chauncy Horton also signed the last modification, which de-obligated funds and assessed liquidated damages (finding 17).

We find it unlikely that the authority expressly granted to Chauncy Horton by Johnny Horton, Sr., included his being the offerror, the signatory on multiple change orders, an acting vice president and the "point of contact" in the CCR, but did not include the execution of the final release. Thus, we find that the government sufficiently demonstrated that Chauncy Horton had actual authority to act on behalf of Horton, including having authority to sign the final release.

### 2. *Apparent Authority*

Even if we found that Chauncy Horton did not have actual authority to bind appellant, the government argues he met the requirements to have apparent authority to contractually bind Horton, including with the final release (gov't br. 28-30). We agree.

"To begin our analysis, we note that the doctrine of apparent authority, although not applicable to the government, can be applied to contractors." *Seven Seas Shipchandlers*, ASBCA No. 57875 *et al.*, 13-1 BCA ¶ 35,193 at 172,678 (*citing Peter Bauwens Bauunternehmung GmbH & Co. KG*, ASBCA No. 44679, 98-1 BCA ¶ 29,551 at 146,497, *aff'd*, 194 F.3d 1338 (Fed. Cir. 1999) (table)). "Apparent authority is established when a third party reasonably believes the actor to possess authority to act for the principal." *Seven Seas Shipchandlers, LLC*, ASBCA No. 57875 *et al.*, 15-1 BCA ¶ 35,908 at 175,530 (citing RESTATEMENT (THIRD) OF AGENCY, § 2.03 (2006); *United States v. Great American Insurance Co. of NY*, 738 F.3d 1320, 1334 (Fed. Cir. 2013)). The restatement further defined apparent authority as "[t]he power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." RESTATEMENT (THIRD) OF AGENCY, § 2.03 (2006).

Here, Chauncy Horton was an agent for Horton whose actions throughout contract performance, assigned and approved by Horton, caused the Army to reasonably believe he had authority to act on behalf of Horton. As stated in the actual authority section, Chauncy Horton was listed on the contract as an authorized official, was input in the CCR as a point of contact, and signed several contract modifications that he testified he was authorized to sign.

Additionally, Chauncy Horton served as the central point of contact to the government during contract performance (finding 5). Chauncy Horton was the main Horton contact to the government employees, including the contracting officer and contract specialist (findings 18-19). He interacted with the government and he

handled all of the invoices (finding 8).  He also negotiated the rate for crushing concrete (finding 10).  Even other Horton employees believed Chauncy Horton was the appropriate Horton official who signed contractual documents (finding 19), including those who signed the final release as witnesses (finding 15).[4]  The government had no reason to doubt Chauncy Horton's authority to execute this document if it raised no eyebrows from appellant's own employees.

Relying largely upon a decision of the Civilian Board of Contract Appeals, *Safe Haven Enterprises, LLC., v. Dep't of State*, CBCA Nos. 3871, 3912, 16-1 BCA ¶ 36,444, appellant argues that there can be no exercise of apparent authority if the principal does not somehow convey its consent for that exercise and that it cannot do so if it is unaware of its exercise.  Appellant then argues that, since there was no evidence presented that Mr. Horton, Sr., knew of Chauncy Horton's signing the release, it cannot have been done with apparent authority.  (App reply br. at 6-8)  While we are not bound by this decision, it appears to be consistent with our case law and other binding authorities.  However, appellant badly misreads it:  under the law cited by *Safe Haven*, the principal need not be conscious of every action by the person acting with apparent authority in order to convey his consent for it; rather, it is enough that the principal acquiesce in actions that imply that the actor possessed the level of authority necessary to bind the company in the way he undertook to.  *Safe Haven*, 16-1 BCA ¶ 36,444 at 177,625-26.  Here, because of the way that appellant was run, with Johnny Horton Sr. seen as the final arbiter of all significant decisions made by the company, it is implausible that he was unaware of the numerous and daily interactions with the Army undertaken by Chauncy Horton that conveyed to it his apparent authority to act on appellant's behalf in matters of contract administration.

Appellant's argument that the government never demonstrated that Chauncy Horton had ever signed a final release before, supposedly refuting his apparent authority to do so, (*see* app. reply br. at 6-9) is similarly misguided.  As discussed above, he presented as having apparent authority to do all things related to the contract's administration without reservation.  Nothing about his behavior or appellant's acquiescence gave the government cause to doubt that his authority should not extend to executing the final release.

CONCLUSION

Chauncy Horton's signature of the final release of claims with no reservations is valid and binding on Horton Construction Company.  Further, because Chauncy Horton had authority to sign the release that he signed, it is unnecessary to

---

[4] Even though some Horton employees testified that they believed Johnny Horton, Sr., was the only person who could act on behalf of appellant, they also testified that this information was never provided to the government (finding 4).

consider appellant's other arguments concerning what clauses should be considered part of the contract.

For the foregoing reasons, this appeal is denied.

Dated: June 2, 2020

HEIDI L. ØSTERHOUT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61085, Appeal of Horton Construction Co., Inc., rendered in conformance with the Board's Charter.

Dated: June 2, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals